658 So.2d 157 (1995)
ESTATE OF Gordon JENKINS, Deceased, Appellant,
v.
RECCHI AMERICA and Alexsis, Appellee.
No. 93-3812.
District Court of Appeal of Florida, First District.
July 19, 1995.
Rehearing Denied August 22, 1995.
*158 Brian D. Guralnick of David G. Eaton, P.A., West Palm Beach, for appellant.
Robert L. Teitler of Walton, Lantaff, Schroeder & Carson, Miami, for appellees.
VAN NORTWICK, Judge.
The estate of Gordon Jenkins appeals an order of the judge of compensation claims (JCC) which determined that Gordon Jenkins' death by suicide was not compensable under the workers' compensation laws. After a thorough review of the record, we conclude that, in determining that Jenkins' estate failed to present sufficient evidence of causation between the employment injury and the suicide, the JCC erred in applying the incorrect legal standard to the causation testimony of the medical experts. As a result, the medical evidence upon which the JCC relied is not competent to support the conclusion reached. Accordingly, we reverse and remand.
Gordon Jenkins and his wife, Inez, were married for almost 40 years. She characterized her husband as a healthy, well-built, intelligent, happy and loving man. He had no prior psychiatric problems. After retiring from one job, he began working for the employer as a bulldozer operator. He was injured on August 28, 1991, when the bulldozer he was operating flipped over, causing him to fall backwards onto the ground. He fractured the L-1 vertebrae, cracked three ribs, struck and injured his head, herniated the L-2/3 disk, and suffered mild bulging of the L-3/4 and L-5/S-1 disks.
Dr. Friend, Jenkins' treating neurologist, diagnosed a closed head injury, possible concussion, and organic brain syndrome manifested by difficulty in concentration, increased anxiety and visual blurring of an unknown etiology. After the accident, Jenkins suffered from constipation, loss of weight, hot flashes, nervousness and anxiety, blurred vision, loss of ability to concentrate, memory fluctuations and daily pain in his lower back for which he wore a plastic brace at all times, except at bedtime. His brace was positioned under his chin and around his neck and continued all the way down his entire back and chest to his pelvis.
On the afternoon of November 17, 1991, Inez Jenkins, a realtor, was conducting an open house across the street from the Jenkins' home. Her husband walked with her to the open house. After greeting the owner of the house, he went home to watch a football game. Later, he returned briefly to give his wife a telephone message. A little after 4:00 PM, Inez returned home to find her husband, dead from a gunshot wound to the head.
Inez Jenkins filed a claim for spousal death benefits. In his order denying the claim, the JCC stated the relevant inquiry as follows:
I was requested to make a determination as to whether or not the claimant's suicide was compensable under the Florida Workers' Compensation Law. In order for a suicide to be compensable under the Florida Workers' Compensation Statute, the claimant's estate would need to prove that the claimant's suicide was not willful. Pursuant to § 440.09(3) Florida Statute (1990), no compensation shall be payable to an employee if the injury was caused by the willful intention to injure or kill himself ... There are exceptions to § 440.09(3) that would allow for a suicide to be found compensable. An intent to injure or to kill oneself is not "willful" for purposes of § 440.09(3) where the initial work related injury and its consequences cause the employee "to become devoid of normal judgment and dominated by a disturbance of mind so as to dethrone his reason and destroy his will."
(Citation omitted).
The JCC's order quotes language from the opinion of the Supreme Court of Florida in Whitehead v. Keene Roofing Co., 43 So.2d 464 (Fla. 1949), interpreting when an employee has "the willful intention ... to injure or kill himself ..." under section 440.09(3), Florida Statutes. In Whitehead, the employee fell from a roof on which he was working *159 and sustained serious bodily injuries resulting in severe pain. Prior to the accident, the employee had been a good-natured man, but subsequent to it, he became morose and ill-humored. A little more than three months after the accident, he swallowed a mixture of potash and lye from which he died four days later. The lower court denied compensability on the grounds that the decedent was aware of what he was doing at the time he took the poison and of the consequences of his act and that his mental condition was such that he had the willful intention to take his own life, and therefore compensability was precluded under section 440.09(3). The Supreme Court disagreed, stating:
[W]e are not persuaded that the fact that a workman knew that he was inflicting upon himself a mortal wound will, in all cases, amount to a "willful intention" to kill himself, within the meaning of the statute. We believe that in those cases where the injuries suffered by the deceased result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, his suicide cannot be considered "willful" within the meaning and intent of the Act.
Id. at 465 (emphasis theirs).
With this language, the Whitehead court rejected the line of cases from other jurisdictions[1] which treated the act of suicide as an independent intervening cause of the death. The court stated:
There is no force to the argument, propounded by some courts, that the act of suicide is an independent intervening cause of the death of the workman, thus breaking the chain of causation from the injury to the death of the deceased. While it may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; that the suicide was merely an act intervening between the injury and the death, and part of an unbroken chain of events from the injury to the death, and not a cause intervening between the injury and death.
(Citation omitted).
The line of cases rejected in Whitehead impose a greater burden on a claimant by requiring that, for a suicide not to be found to be an independent intervening cause it must result from an uncontrollable impulse, delirium or frenzy, without knowledge of the physical consequences of the act. Under Whitehead, however, the court held that for suicide not to be considered a willful act of the employee, the work-related injury "... must cause the employee to become devoid of normal judgment and dominated by a disturbance of mind resulting in the act of suicide." Id. at 465. In other words, the deceased's suicide act is not willful when the act is caused by a disturbance of mind which, in turn, is caused by the employment injury.
Thus, in Florida, compensability turns not on "the fact that a workman knew that he was inflicting upon himself a mortal wound," id. (emphasis theirs), or that he was governed by an uncontrollable impulse at the time of the suicide, but rather on the existence of "an unbroken chain of events from the injury [to the mental disturbance] to the death." Id. This legal test follows the majority rule in United States jurisdictions and is generally known as the "chain of causation" *160 test. 1A A. Larson, The Law of Workmen's Compensation § 36.30 (1993).
The Florida Supreme Court revisited this issue in Jones v. Leon County Health Department, 335 So.2d 269 (Fla. 1976), and found a suicide death claim compensable and outside the proscription of section 440.09(3). In Jones, the decedent had directed a tuberculosis program for his employer and contracted the disease, passing it along to his entire family. He became nervous and restless and utterly obsessed with his illness, losing over 40 pounds. Six months later, he committed suicide. In reversing the dismissal of the claim by the Industrial Relations Commission, the court stated:
The record before us contains competent substantial evidence to support a finding that without the contacting [sic] of tuberculosis, there would have been no suicide, and that the tuberculin condition of the deceased, contacted [sic] after a special association therewith for twenty years through administration of the program in his employment, caused him to become devoid of normal judgment and dominated by a disturbance of mind so as to dethrone his reason and destroy his will so that he was incapable of forming a willful intent to take his life.
Id. at 272 (emphasis theirs). By this decision, the court made it clear that for a suicide not to be considered a willful act of the employee, the work-related injury must cause the employee's mental illness which causes the suicide. Further, the court again rejected the Sponatski rule and its progeny, supra, fn. 1, which would require the employment-related injury to cause an absolute loss of reason before a suicide death will be compensable.
In City of Tampa v. Scott, 397 So.2d 1220 (Fla. 1st DCA), rev. denied, 411 So.2d 381 (Fla. 1981), Scott suffered a back injury which triggered an underlying anxiety neurosis that caused him to commit suicide. The deputy commissioner ruled the claim for death benefits was compensable based upon evidence "that Scott's suicide was directly caused by the severe psychiatric disturbance which was precipitated by the injury." Id. at 1221. He found that Scott's pre-existing condition was a significant factor causing his death and concluded that Scott's death resulted equally from the pre-existing condition and the employment-related injury. This court affirmed stating that Scott's back injury "while not the direct cause of the suicide, was the triggering factor." Id. at 1222. The court cited Whitehead for the proposition that a claim will be compensable "when a decedent's injury caused him so much distress that he became devoid of normal judgment prior to committing suicide," and concluded that because of Scott's "neurosis, which was aggravated by his back injury, Scott did not form a willful intent to take his own life," within the meaning of section 440.09(3). Id. at 1222.
The JCC ruled below that "the claimant was not devoid of normal judgment at the time of the suicide" based upon the opinion of Dr. Goldstein, the expert provided by the employer/carrier, and that, therefore, the claim was not compensable. Specifically, the JCC said:
I accept the opinions of Dr. Goldstein who opined that the claimant was not devoid of normal judgment at the time of suicide and was not dethroned of his ability to reason. I also accept his opinions that the claimant was not in a delirium or a frenzy at the time of the suicide. I accept Dr. Goldstein's opinion that the claimant acted rationally and made a conscious decision on his own to take his life. I accept the opinion of Dr. Goldstein that the claimant was aware of the consequences of what he was doing. Dr. Goldstein also testified that but for the workers' compensation accident the claimant probably would not have committed suicide. I also accept the opinions of Dr. Goldstein that the accident increased the probability of the suicide.
The JCC determined that Jenkins' estate had "not presented any competent substantial evidence as to whether or not the claimant was using normal judgment at the time of his suicide." The JCC reached this conclusion because he determined that the estate's expert, Dr. Zielinski, "was unable to render an opinion as to whether the claimant was using normal judgment and dominated by a disturbance of mind so as to dethrone his reason and destroy his will" at the time of *161 the suicide. Even though Dr. Zielinski testified that the suicide was the result of Jenkins' depression and that the depression had been caused by the pain and injuries Jenkins had incurred in the employment accident, the JCC rejected such evidence because, as the JCC stated, "that is not the legal test for compensability of a suicide." In reaching this conclusion, we believe that the JCC erred as a result of a misapprehension of the applicable law.
It is immediately apparent from his order and the examination of the expert witnesses[2] that the JCC was mistaken about *162 the applicable test for compensability under section 440.09(3). In his order, he expressly found that "but for the injuries and depression from the work accident the suicide would not have occurred." But then he stated "that's not the legal test for compensability of the death or the suicide," when in fact it is a central element of the test established by the Florida Supreme Court in Whitehead, 43 So.2d at 465. Under Whitehead and its progeny, the suicide death is compensable where the evidence shows that the employment injury causes a mental disturbance, such as serious depression, involving a loss of normal judgment, which mental disturbance in turn is the cause of the employee's suicide. Under such circumstances, a suicide is not willful within the meaning of section 440.09(3).
In questioning Dr. Zielinski below, the JCC focused on the non-determinative factors of whether Jenkins' suicide was the result of an "uncontrollable impulse" or done in a "delirium or frenzy" and whether he made a "conscious decision" to kill himself. In deciding Whitehead, however, the Supreme Court rejected the Sponatski rule, supra, fn. 1, and the components upon which it is based, including the "uncontrollable impulse" factor and the "knowledge of physical consequences" factor.
We agree with the argument of appellant in this case that the JCC confused the chain of causation rule, which is applied in Florida, with the Sponatski rule, which is not. The dialogue between the JCC and Dr. Zielinski is replete with instances in which the JCC asked the doctor to give testimony on factors not controlling under the correct test. Based upon the JCC's questions to Dr. Zielinski and the JCC's order, it is clear that the JCC misapprehended the legal standards for compensability of this claim. This court recently held that where the JCC applies an incorrect legal standard in arriving at a determination on causation, the JCC's order will be reversed. Ackley v. General Parcel Service, 646 So.2d 242 (Fla. 1st DCA 1995).
The fact that Dr. Goldstein opined that Jenkins was not devoid of normal judgment at the time of this suicide does not save this case from reversal. Dr. Goldstein acknowledged that "the probability of suicide significantly increased as a result of the depression and anxiety that Mr. Jenkins was experiencing following his injury," but concluded, nevertheless, that he "did not see any evidence that Mr. Jenkins was devoid of his mental capacity to make decisions." It is apparent from the record that Dr. Goldstein concluded that Jenkins was not devoid of normal judgment at the time of the suicide based upon the expert's expressed belief that Jenkins "fully understood what it was that he was doing, and he fully understood the consequences of pulling the trigger and shooting himself."[3] The Supreme Court expressly *163 ruled in Whitehead, 43 So.2d at 465, however, that the fact that the employee knew the fatal consequences of his suicide act is not determinative of the issue of an employee's "willful intention ... to ... kill himself" within the meaning of section 440.09(3).[4] Thus, since Dr. Goldstein's opinion was founded on a factor that is not determinative of the question of causation between an employment injury and the suicide under Florida law, the opinion was not competent evidence and cannot support the JCC's order. Tenbroeck v. Castor, 640 So.2d 164, 168 (Fla. 1st DCA 1994) (an expert's opinion, if "based ... upon a conclusion contrary to established Florida law, does not constitute competent, substantial evidence supporting the action taken ...").
REVERSED and REMANDED for further proceedings consistent with this opinion.
ZEHMER, C.J. and KAHN, JJ., concur.
NOTES
[1] Though not expressly mentioned by the court, it is evident that the Whitehead court was referring to the rule established in In re Sponatski, 220 Mass. 526, 108 N.E. 466 (Mass. 1915), which treats the mental illness which manifests in the suicide as an independent intervening cause of death which breaks the "chain of causation" between the injury and the suicide. The Sponatski court set forth the rule as follows:

[W]here there follows as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy `without conscious volition to produce death, having knowledge of the physical consequences of the act,' then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary willful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act even though choice is dominated and ruled by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury.
Id., 108 N.E. at 468.
[2] Certain relevant portions of the testimony of Dr. Zielinski, as elicited from questions asked by the JCC, follows:

[THE COURT] Now, the reason we're here is because not every suicide that directly results from an industrial on-the-job injury and the residuals of the sequela from that injury is necessarily compensable.
A. [Dr. Zielinski] Okay.
Q. For example, on this case I have found and I entered a ruling telling the attorneys my inclination of what I'm going to do in the case. But in this case I found that the work accident and the claimant's depression that was caused by the work accident was the competent producing cause of the suicide.
A. Yes.
Q. In other words, but for the injuries and the depression from the work accident the suicide would not have occurred.
However, that's not the legal test for compensability of the death or the suicide.
A. Okay.
Q. And, therefore, I would like to go ahead and ask you some additional questions to clarify ...
* * * * * *
Q. In other words, was he so dominated by a disturbance of mind directly caused by his injury and his consequences that this suicide could not be considered to be a willful conscious act?
And, again, in other words, was this suicide the result of an uncontrollable impulse, was it done in a delirium or frenzy or did Mr. Jenkins injuries cause him to become devoid of normal judgment and dominated by disturbance of mind so as to destroy his reason and destroy his will to the extent that he was incapable of performing a willful intent to take his life?
* * * * * *
A. As far as I could determine, okay, when someone makes  you know, commits suicide, you know, in essence they're not looking at reality appropriately.
I think his suicide is  and I don't know exactly, if I'm answering your question or not and I'm sure you'll guide me.
Q. Sure.
A. And because of the massive or I'll say grades of physical injury because of his depression I think that caused him to act inappropriately in shooting himself.
In other words, if he didn't have the accident I don't think there's any issue in terms of him killing himself.
Q. Okay. But, again, that's not exactly the legal test here.
We know and I already found that there is a casual relationship between the injuries and the suicide, the ultimate suicide that he suffered.
The problem we run into in this case is if someone has a willful intent to injure themselves or others that's not a compensable occurrence.
So, I need to determine these questions, and the answers to these may be no.
But basically do you feel that he was so devoid of normal judgment so that he didn't know what he was doing and it negated any willful intent that he might have had to kill himself?
* * * * * *
A. I can give you an opinion that, you know, I think when someone does that behavior that they're really not rationally looking at the consequences of that behavior but at that moment in time when they're so upset or depressed they might choose to do that behavior to kill themselves, okay.
Q. Maybe that's what we should concentrate on was his depression to the extent that he would not have been able to formulate a conscious intent to take his own life and perhaps it was not that severe 
A. Yes.
Q.  and that's basically the question.
It's probably  and I mentioned to counsel already that this may well be a question of degree.
A. Yeah. I think, you know, the depression certainly was there. I[t] certainly contributed in my estimation of his suicide.
The question is was that  was he in his right mind 
Q. Right. Did he know what he was doing at the time or was he so dominated by a disturbance of mind as a result of these injuries and the problems from the injuries that this act was essentially an uncontrollable impulse.
A. Well 
Q. It may not have been.
A. It could be, Judge. I think he's the only one that could answer that. I mean I really can't say.
* * * * * *
His depression was certainly there and it would be a part of his choice of shooting himself. I don't think he would have shot himself if he weren't depressed.
Q. Right.
* * * * * *
Q. Someone can make I suppose a conscious decision to commit suicide?
A. That's correct.
Q. And that's the difficulty with this case 
A. Yeah.
Q.  did he make a conscious decision or was he unable to have done that?
A. Yeah. Well, I think  again, I think that, you know, his action was certainly  his depression and suicide was  I mean his depression and his pain were certainly related to the injury and that was part of his depression was then caused him to commit suicide.
Now, whether he was rational or irrational at that moment in time I can't say. (R-143-149).
(Emphasis supplied).
[3] The following answer to the closing question asked during Dr. Goldstein's direct examination is an example of the expert's reliance on his belief that Jenkins understood the consequences of his suicidal act:

Q. Based upon your review of the records, do you have an opinion as to whether Mr. Jenkins willfully took his own life?
A. Based upon everything available to me, it seems as though Mr. Jenkins would have been aware of the consequences of what he was about to do and what he eventually did no (sic).
In addition, when asked on cross-examination to explain his opinion that Jenkins was not devoid of normal judgment at the time of his suicide and was not dethroned of his ability to reason, Dr. Goldstein said:
I will agree with what I have already testified to, in that I believe that Gordon Jenkins understood what the consequences would be of his pulling the trigger, and that he fully understood that if he pulled the trigger, he would die or come close to death or be seriously maimed, injured, or deformed for the rest of his life if he survived.
[4] The Whitehead holding is consistent with the general rule that whether the decedent knew the physical consequences of his act is irrelevant to the question of causation. 1A A. Larson, The Law of Workmen's Compensation, § 36.22 (1993).