670 So.2d 977 (1996)
STATE, DEPARTMENT OF TRANSPORTATION, Appellant,
v.
L.N. MURRAY, et ux, et al., Appellee.
No. 94-3068.
District Court of Appeal of Florida, First District.
January 19, 1996.
*978 Thornton J. Williams, General Counsel, Marianne A. Trussell, Assistant General Counsel, Department of Transportation, Tallahassee, for Appellant.
David W. Foerster of Foerster, Isaac, and Yerkes, Jacksonville, for Appellees.
PER CURIAM.
Pursuant to an eminent domain proceeding, the Department of Transportation took a portion of appellees' restaurant parking lot for the expansion of a state road, and the jury awarded appellees both severance and business damages. The Department raises two issues on appeal regarding these two types of damage. We affirm on the first issue and reverse as to the second issue.
The Department first contends that the trial court erred by denying the admission of expert testimony of a cost-to-cure the effect of the partial taking of the restaurant's parking lot. Section 73.071(3), Florida Statutes, authorizes an award of severance damages for a taking of less than the whole of a business property. "The cost of effecting physical changes or modifications in the premises necessitated by a taking are in the nature of damages to the remainder or severance damages, not business damages." LeSuer v. State Road Dep't, 231 So.2d 265, 268 (Fla. 1st DCA 1970).
In the instant case, the Department sought to present a mitigating "cost-to-cure" proposal demonstrating that the remaining property could be restored to its original utility and value. The Department proffered expert witness testimony that thirteen spaces would be taken, but a complete cure was available that effectively negated severance damages. Five spaces could be added to the end of the existing parking bays, and eight spaces could be created by striping a paved area on the east side of the restaurant that was used for overflow parking during peak business periods. After hearing the Department's proffer, the trial court disallowed that part of the cure testimony relating to the striping and use of the paved area for eight parking spaces. The decision was based on the court's erroneous belief that a previous judge's ruling disallowing this testimony on the issue was the law of the case. Keathley v. Larson, 348 So.2d 382, 384 (Fla. 2d DCA 1977), cert. denied, 358 So.2d 131 ("[W]here one judge has made an interlocutory order in the case, and for some reason is properly removed from the case and another judge properly assigned ..., the successor judge can vacate that prior interlocutory order while the case is still pending and has not yet gone to final judgment."). We affirm the exclusion of this part of the cure testimony for another reason.
In both State Department of Transportation v. Byrd, 254 So.2d 836 (Fla. 1st DCA 1971), disapproved in part on other grounds, *979 Broward County v. Patel, 641 So.2d 40 (Fla. 1994), and Williams v. State Department of Transportation, 579 So.2d 226 (Fla. 1st DCA 1991), disapproved in part on other grounds, Broward County v. Patel, 641 So.2d 40 (Fla. 1994), the Department took part of the parking lot of each business through an eminent domain proceeding, and in both cases the cure testimony presented by the Department was determined by this court to be inadmissible as a matter of law because in developing its proposed cures the Department failed to account for valuation factors compensable as severance damages.
In the instant case, the Department ignores the fact that the area it proposes to stripe as replacement for spaces taken already is used for overflow parking. As a result, the expert's opinion ignores the reduction in value of the restaurant business with a smaller parking area available for customer use or a lesser area for parking expansion in the unstriped parking area. The testimony was therefore inadmissible as a matter of law as it was in Byrd, supra, and on this basis we affirm the court's exclusion of part of the cost-to-cure proposal.
The second issue presented is whether appellees' expert witness testimony on business damages was insufficient as a matter of law. The allowance of business damages under section 73.071(3), Florida Statutes, is a legislative grant and is not constitutionally required. Tampa-Hillsborough County Expressway Auth. v. K.E. Morris Alignment Serv., Inc., 444 So.2d 926 (Fla.1983). "[A]ny ambiguity in section 73.071(3)(b) should be construed against the claim of business damages, and such damages should be awarded only when such an award appears clearly consistent with legislative intent." Id. at 929. The property owner in an eminent domain proceeding has the burden of proof on this issue. City of Fort Lauderdale v. Casino Realty, Inc., 313 So.2d 649 (Fla.1975).
Section 73.071 does not define "business damages," but this court has stated that business damages "are more in the nature of lost profits attributable to the reduced profit-making capacity of the business caused by a taking of a portion of the realty or improvements thereon." LeSuer v. State Road Dep't, 231 So.2d 265, 268 (Fla. 1st DCA 1970). Business damages, however, are not limited to lost profits. See Matthews v. Division of Admin., Dep't of Transp., 324 So.2d 664, 668 (Fla. 4th DCA 1975) ("[P]articularly, where a business is totally destroyed, there are business losses beyond profit losses, attached to moving or selling equipment and loss of goodwill....").
In the instant case, Appellees' expert witness testified that he conducted a "deprivation appraisal" of the future lost profits of the restaurant stemming from the net loss of restaurant parking spaces after the taking. He determined the gross profits during peak periods, deducted certain "variable expenses," determined an annual lost profit figure, and then capitalized this figure to arrive at total lost profits. Fixed expenses, such as advertising, depreciation, insurance, utilities, and Appellees' salaries were purposefully excluded from the analysis. The Department argues that despite the appellation given it, the above is a lost profit analysis. Fixed expenses are incurred regardless of any loss of available parking and are a necessary factor of the lost profit analysis. We agree.
In State Department of Transportation v. Manoli, 645 So.2d 1093 (Fla. 4th DCA 1994), the court ruled that in calculating business damages using lost profits, wages of the owner who operated the service station should be deducted in the analysis. If the owner is not receiving a wage, then a calculation of the reasonable value of the owner's services must be made. The court held that the expert testimony was inadmissible because it was based on a misconception of the law.
A party seeking lost future profits must prove the amount of lost profits with reasonable certainty. Forest's Mens Shop v. Schmidt, 536 So.2d 334 (Fla. 4th DCA 1988). A determination of lost profits must deduct operating expenses and costs and the actual salary paid to supervisors or the reasonable value of same. Indian River Colony Club, Inc. v. Schopke Constr. & Eng'g, Inc., 619 So.2d 6 (Fla. 5th DCA 1993). In addition, a *980 lost profit computation must consider fixed expenses, such as overhead. Pahokee Housing Auth., Inc. v. South Florida Sanitation Co., 478 So.2d 1107 (Fla. 4th DCA 1985), review denied, 491 So.2d 280 (1986).
In the instant case, the expert's lost profit analysis did not account for fixed expenses. Such testimony is inadmissible as a matter of law and should have been stricken. See Manoli, supra. We therefore reverse on this issue. We certify the following question, however, as being one of great public importance:
IN AN EMINENT DOMAIN CASE IN WHICH AN ESTABLISHED BUSINESS IS NOT TOTALLY DESTROYED BY A TAKING, DOES SECTION 73.071(3)(b), FLORIDA STATUTES, CONTEMPLATE CALCULATION OF BUSINESS DAMAGES BY ANY MEANS OTHER THAN A LOST PROFIT ANALYSIS? IN THE INSTANT CASE IS THE EXPERT'S BUSINESS DAMAGE CALCULATION A LOST PROFIT ANALYSIS REQUIRING THE DEDUCTION OF FIXED EXPENSES, SUCH AS SALARIES, INTEREST, DEPRECIATION, AND UTILITIES, OR AN ALTERNATIVE ANALYSIS, COGNIZABLE UNDER SECTION 73.071(3)(b), BASED ON DEDUCTION OF CERTAIN VARIABLE EXPENSES AND THE EXCLUSION OF FIXED EXPENSES FROM THE ANALYSIS?
Appellees' motion to dismiss is denied. The cause is affirmed in part and reversed in part and remanded for new trial in accordance with this opinion.
ERVIN and MINER, JJ., concur.
BENTON, J., concurs and dissents with opinion.
BENTON, Judge, concurring and dissenting.
I would affirm the judgment entered by the trial court in its entirety. Together with evidence of the facts on which it was based, a certified public accountant's testimony was received explicating a "deprivation appraisal" he did in order to ascertain the effect of anticipated losses in sales on gross profits and so on the value of the restaurant as an enterprise. In my view, this evidence was sufficient to support the portion of the judgment the court today reverses.
The jury had to decide what the taking of parking places would do to the restaurant's value as a business. Mr. Fetherman, the certified public accountant, testified that the value of a going business depends on its profitability, then explained his estimate of the effect on profits (or losses) sixteen fewer parking places would have. There was evidence that the Department of Transportation took sixteenor 25%of sixty-four parking places. After estimating "lost profits" on an annual basis, the accountant "capitalized" the recurring shortfall he predicted, in this way valuing at $105,000 the reduction in the "profit-making capacity of the business caused by a taking of," LeSuer v. State Road Dep't, 231 So.2d 265, 268 (Fla. 1st DCA 1970), a quarter of its parking places.
During most of the restaurant's hours of operation, he concluded, lost parking places would have no effect because they would have been vacant anyway. The jury was free to find, however, that, as the accountant testified, less parking will mean less revenue at peak hourshours during which (before the taking) the parking lot filled (or almost filled)periods in which 35.1% of the restaurant's sales occurred. Multiplying the percentages, the accountant arrived at a percentage of sales the loss of parking spaces would likely occasion8.8%. Corresponding to this diminution in revenue, certain expenses will also decrease, according to the testimony, including the cost of food the restaurant would otherwise have served.
On the assumption that variable costs varied directly with salesan assumption not questioned on appeal, the accountant calculated historical variable costs as a percentage of historical sales (23.3%), and multiplied this percentage by a weighted average sales figure similarly based on historical data ($701,428). Multiplying the result ($163,443) by the percentage of sales projected to be lost (8.8%) yields a figure ($14,382.98) representing the projected diminution in variable costs associated with the projected loss of sales.
*981 The accountant also reduced the $701,428 sales figure by deducting the cost of goods sold ($299,965) to arrive at gross profits ($401,463). Multiplying gross profits by the percentage of sales projected to be lost (8.8%) yields a figure ($35,328.74) representing the amount against which the projected diminution in variable costs associated with the projected loss of sales must be offset in order to determine the effect on profits: a drop of $20,946 was projected. (Mr. Fetherman reached this result by taking the offset before multiplying by the percentage of sales projected to be lost.)
As long as there is reason to believe an enterprise will remain viable, a "lost profits analysis" is appropriate even though tax accounting shows losses. If losses instead of profits occur both before and after the loss in revenue, the significance of the change (increase) in losses is comparable to the significance of the change (reduction) in profits, when a loss of revenue diminishes profits. Here tax losses have not prevented family members from taking substantial salaries, and the jury had ample evidence from which to conclude that the restaurant would stay in business.
The majority opinion seems to misapply to the present case decisions in cases where the parties litigated the amount of future profits closing a business down altogether would cause. Projecting lost profits in such cases does indeed require deducting projected expenses of all kindsfixed and variablefrom projected revenues. Net profits which will cease completely when the business closes are appropriate indicators of the magnitude of profit-making capacity that will be lost with the business's demise.
Here, however, certain expenses, including capital costs, insurance, certain taxes, advertising, utilities, and certain employees' (including family members') salaries, will be incurred whether or not revenue falls off as projected, or so the jury was free to find. In the present case, if Mr. Fetherman had calculated fixed costs and deducted them from gross profits, net profits could have been determined, but the difference in net profits attributable to the projected loss in sales would have been the same as the projected $20,946 difference in gross profits. Appellee's expert properly excluded fixed costs from his differential analysis, on the assumption that fixed costs would be incurred after the taking just as before.