849 So.2d 279 (2003)
FLORIDA DEPARTMENT OF TRANSPORTATION, Petitioner,
v.
ARMADILLO PARTNERS, INC., Respondent.
No. SC01-1014.
Supreme Court of Florida.
April 24, 2003.
Rehearing Denied June 26, 2003.
*281 Charles J. Crist, Jr., Attorney General and Robert I. Scanlan, Assistant Attorney General, Tallahassee; and Marianne A. Trussell, Deputy General Counsel, Department of Transportation, Tallahassee, for Petitioner.
Geoffrey L. Jones of Jeck, Harris, & Jones, LLP, Jupiter, for Respondent.
Mark R. Leavitt of Wilson, Leavitt & Small, P.A., Orlando; and Alan E. DeSerio, Brandon, for Manheim Remarketing Limited Partnership, d/b/a Florida Auto Auction of Orlando and Florida Auto Auction of Orlando, Inc., Amicus Curiae.
PER CURIAM.
We have for review the decision in Armadillo Partners, Inc. v. State Department of Transportation, 780 So.2d 234 (Fla. 4th DCA 2001), on the basis of conflict with the decisions in Rochelle v. State Road Department, 196 So.2d 477 (Fla. 2d DCA 1967), and State Road Department v. Falcon, Inc., 157 So.2d 563 (Fla. 2d DCA 1963). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. For the reasons set forth below, we quash the Fourth District's decision rejecting the admission of an eminent domain expert's opinion testimony as to the value of the remaining property after a partial taking.

FACTUAL BACKGROUND
In 1997, the Department of Transportation ("DOT") initiated eminent domain proceedings to acquire approximately a nine-foot-wide strip of land bordering Davie Road and a forty-six-foot-wide strip of land along Griffin Road for purposes of a road widening and improvements project in Broward County.[1] At that time, Armadillo Partners, Inc., owned a shopping center, known as Armadillo Square, located at the intersection of Davie Road and Griffin Road. At the time of the taking, the shopping center contained two buildings with 26,013 square feet of retail, office, and restaurant space and a total of 140 parking spaces, 119 spaces in front and 21 spaces in the rear. As a result of the DOT project, a portion of the shopping center's parking lot was taken, resulting in a reduction of usable parking spaces.
In the court proceedings Armadillo sought severance damages in addition to compensation for the property actually taken. At trial, appraisers for both parties testified that the shopping center could not continue to operate if no action was undertaken to renovate the property after the taking. Both appraisers agreed that if no action was taken the value of the remaining property would be limited to the value of the raw land, less the cost of demolition. However, both parties submitted proposals and expert opinion testimony in support thereof as to ways the remaining property could be improved to minimize the effect of *282 the partial taking on the value of the remaining property. These proposals for improvement are also referred to as "cures" to the damage inflicted by the partial taking.
DOT's proposed cure, which reconfigured the shopping center's parking lot to increase the available parking to 97 spaces, involved shifting the front parking lot closer to the north-south building by approximately nine feet. Under this proposed cure, an existing improved area approximately nine feet by 180 feet at the front of the north-south building, consisting of a sidewalk with brick pavers, planted areas, an irrigation system, grass and two wooden arbor structures, would be eliminated. According to the opinion testimony of DOT's expert appraiser, the severance damages incurred as a result of the project would be $308,400, plus an additional $102,300 for the cost to cure under its proposal.
On the other hand, Armadillo's proposed cure as outlined by its expert appraiser entailed removing over 7000 square feet from the north end of the north-south building, closing one of the driveways on Griffin Road, and reconfiguring the parking lot to accommodate 99 parking spaces. Under this so-called "cut and reface" cure, the sidewalk and related amenities eliminated by the DOT plan would be left intact.[2] Armadillo's appraiser concluded that the severance damages would be $493,000, and the cost to cure under its proposal would be $425,000. DOT's and Armadillo's appraisers estimated total compensation for the entire taking and its effects, including the taking of the forty-six foot strip, at $637,600 and $1,235,000, respectively.
The jury returned a verdict awarding total compensation in the amount of $817,450, including $308,400 in severance damages and $318,750 for the cost to cure. The trial court entered a final judgment pursuant to the jury verdict and Armadillo appealed.
On appeal, the Fourth District reversed the final judgment. See Armadillo Partners, 780 So.2d at 237. Relying on a line of cases from the First District,[3] the district court concluded that DOT's appraiser did not properly consider all of the factors necessary for an evaluation of severance damages, and thus his testimony should have been excluded. See 780 So.2d at 236. Specifically, the district court stated that no provision was made in the appraiser's valuation as to severance damages and the cost to cure, for the loss of the shopping center's existing arbor area. See id. In addition, the district court concluded the trial court erred in admitting testimony regarding DOT's proposed cure because it was inconsistent with DOT's existing construction plans for the adjacent roadways. See id. at 236-37.

ANALYSIS
This Court has recognized that "[t]he central policy of eminent domain is that owners of property taken by a governmental entity must receive full and fair compensation." Broward County v. Patel, 641 So.2d 40, 42 (Fla.1994) (citing art. X, § 6, Fla. Const.). When less than the *283 entire property is being appropriated, "full compensation for the taking of private property by eminent domain includes both the value of the portion being appropriated and any damage to the remainder caused by the taking." Division of Admin. v. Frenchman, Inc., 476 So.2d 224, 226 (Fla. 4th DCA 1985); see also Kendry v. Division of Admin., 366 So.2d 391, 393 (Fla. 1978); § 73.071(3)(a)-(b), Fla. Stat. (2001). The damage to the remainder caused by the taking is also referred to as severance damages, damage caused by severing a part from the whole. In calculating the damage to the remaining property, Florida courts have adhered to a "before and after" rule under which severance damages are calculated as the difference between the value of the property before and after the taking. See Canney v. City of St. Petersburg, 466 So.2d 1193, 1195 (Fla. 2d DCA 1985).

Valuation of the "Arbor Area"
It is the calculation of severance damages that is at issue here. As noted above, the Fourth District concluded that the DOT expert's calculation of severance damages did not sufficiently include the loss of the arbor area as contemplated in its cure, and as a result, the court held that the testimony was improperly admitted into evidence. The Fourth District relied on a series of cases from the First District. See State Dep't of Transp. v. Murray, 670 So.2d 977 (Fla. 1st DCA 1996), quashed on other grounds, 687 So.2d 825 (Fla.1997); Williams v. State Dep't of Transp., 579 So.2d 226 (Fla. 1st DCA 1991), disapproved in part by Broward County v. Patel, 641 So.2d 40 (Fla. 1994); State Dep't of Transp. v. Byrd, 254 So.2d 836 (Fla. 1st DCA 1971), disapproved in part by Broward County v. Patel, 641 So.2d 40 (Fla.1994).
In Byrd, as part of a road-widening project, DOT condemned a strip of land that was used by a motel for parking. On appeal, DOT argued that the trial court erred in refusing to admit testimony of the department's appraiser that the taking would not result in severance damages because the lost parking spaces could be relocated on a portion of the motel's property where a shuffleboard court was located. The district court, however, concluded that the trial court properly excluded the appraiser's testimony because it was based upon a misconception of the law of severance damages and failed to take into account the loss of use of the shuffleboard court area. See id. at 837. The district court explained, "The expert's opinion ignores the reality of the missing shuffleboard court or if the same were to be rebuilt on yet another portion of appellees' property, the expert ignores the reduction in value of a motel with smaller grounds for its guests to enjoy or perhaps lesser area for expansion." Id. at 836-37.
Similarly, in Williams the First District held that DOT's expert's testimony was based on a misconception of the law. At trial, the expert first testified that the taking would result in severance damages of $177,000 if nothing was done to correct the loss of parking. However, the expert stated that a rear parking area could be constructed on the remaining property at a cost of approximately $24,000. The expert opined that the value of the remainder property converted to parking was $48,000. Thus, the expert concluded that all of the damages and effects to the remainder could be cured by the payment of $72,000. Relying on Byrd, the district court concluded that the expert's testimony was based on a misconception of the law and should not have been admitted. See 579 So.2d at 229. Specifically, the court stated that the expert's opinion ignored the fact that the new parking area would not provide *284 as much space for parking as existed before the taking and that the new parking area would intrude into the service area, and ignored the impact that rear parking for customers might have on the value of the property as a business site, as well as the fact that the new parking area would prevent further expansion of the business. See id.
In State Dep't of Transp. v. Murray, 670 So.2d 977 (Fla. 1st DCA 1996), quashed on other grounds, 687 So.2d 825 (Fla.1997), the First District reaffirmed its previous holdings in Byrd and Williams. In Murray, DOT condemned a portion of a restaurant's parking lot for the expansion of a state road. At trial, DOT proffered expert testimony that thirteen spaces would be taken, but a complete cure was available that effectively negated severance damages. Specifically, five spaces could be added to the end of the existing parking bays, and eight spaces could be created by striping a paved area on the east side of the restaurant that was used for overflow parking during peak business periods. The trial court disallowed that part of the cure testimony relating to the striping and use of the paved area for eight parking spaces.
On appeal, the First District approved the trial court's action, relying on Byrd and Williams: "[T]he Department ignores the fact that the area it proposes to stripe as replacement for spaces taken already is used for overflow parking. As a result, the expert's opinion ignores the reduction in value of the restaurant business with a smaller parking area available for customer use or a lesser area for parking expansion in the unstriped parking area." See Murray, 670 So.2d at 979.
We subsequently quashed the First District's decision in Murray on other grounds. See Murray v. Dep't of Transp., 687 So.2d 825 (Fla.1997). In so doing, we limited our review to consideration of the certified questions not directly related to the pending issues, and expressly declined to address that portion of the district court's opinion regarding whether the trial court erred by excluding testimony concerning DOT's cost-to-cure proposal. See id. at 826.

Severance Damages
In the instant case, the parties differ as to how the value of the arbor area should be treated. Armadillo asserts that the appropriation of the arbor area in effect constitutes a separate element of damages, as if the arbor area is actually a second taking, and that DOT's appraiser is obligated to value this area before his opinion evidence would be admissible. On the other hand, DOT contends that the district court erred in holding that the expert's testimony was improperly admitted because the proposed cure did not include specific compensation for the appropriation of the arbor area, and the holding is in conflict with this Court's decision in Broward County v. Patel, 641 So.2d 40 (Fla. 1994). DOT asserts that under Patel, an appraiser's testimony concerning a proposed cure is permissible so long as the expert takes into account the cost of the cure and the appropriation or effect of the proposed cure on other areas of the property in assessing the fair market value of the remaining property on the day of the taking.[4]

*285 Patel

Importantly, this Court in Patel stressed that the availability of a future "cure" is "relevant only to the extent it may have an impact upon fair market value [of the remaining property] as of the moment of the taking, and not otherwise." Patel, 641 So.2d at 43. Relatedly, this Court recognized that "any loss to [the condemnees] by virtue of the appropriation of other areas of their property ... should be taken into account in determining fair market value on the day of the taking, along with associated reasonable costs." Id. at 44 n. 8. We cautioned, however, that "[w]hen admitting evidence of future contingencies... the trial court must ensure that the finder of fact does not mistakenly assume that their cost or value can be considered apart from the effect on market value." Id. at 43 n. 7.
Thus, we held in Patel that in a partial taking case, evidence as to the cost to cure may be admissible as a factor to be considered in determining the amount of recoverable damages to the remainder parcel. In effect, the "cost to cure" is the cost of an attempt to ameliorate the damage to value sustained by the property as a result of the partial taking by the government. The theory is that it is more economical to spend additional money on a "cure" to restore value to the remaining property because the "cure" will restore more lost value than its "cost."
However, as our opinion in Patel makes clear, while the cost to cure may be relevant evidence on the issue of damages, it is not a measure of damages to be separately assessed without reference to the reduction in fair market value of the remaining property. As noted in Patel:
[A] knowledgeable buyer would offer less value for property that may require significant future expenses and more value for property with minimal future expenses. Likewise, the value of future improvements that may be probable also will factor into the equation when a knowledgeable buyer determines fair-market price.
Id. at 43. Indeed, as a leading authority in the field of eminent domain has cautioned, "costs to cure while admissible for the purpose of establishing just compensation do not create individual rights to damage, but are merely evidence of the effect of the taking upon the market value and therefore upon diminution in value of the remainder." 4A Julius L. Sackman, Nichols' The Law of Eminent Domain, § 14A.04[2], at 14A-99 (rev.3d ed.2001). Thus, "cost to cure and other elements resultant from the taking are only admissible on the issue of just compensation if they are tied to their effect upon fair market value." Id. § 14A.04[2][a], at 14A-101.
We agree with this explanation of severance damages and the use of cost to cure proposals in determining the fair market value of the remaining property after a partial taking. In doing so, we reject any suggestion that a property owner is entitled to additional compensation as a taking when the government's cure proposal includes a change in use of a portion of the remaining property. Of course, there is no actual additional taking and the change in use is simply an economic proposal to maintain or improve the value of the remaining property.

*286 EXPERT OPINION TESTIMONY
Initially, we conclude that the district court erred in its application of the principles discussed in Patel to exclude the testimony of DOT's appraiser. DOT's appraiser largely based his opinions as to value on the property's rental value compared to other similar properties. The expert initially indicated that the reduction in the property's rental value was primarily a result of the reduced parking and that he did not believe there would be any severance damages, other than the cost to cure, if rental income for the property remained the same after implementing DOT's cure. Upon additional cross-examination, however, he further explained his valuation process and considerations, including a consideration of the loss of the arbor area.[5] Hence, we conclude that the opinion evidence of DOT's appraiser was properly admitted as evidence of the value of the property remaining, assuming the improvements made to the property were accomplished pursuant to the appraiser's plan to cure.

Rochelle and Falcon, Inc.

We also find the district court's opinion in conflict with a persuasive line of cases from the Second District which have held that the method of evaluation applied *287 by an appraiser should ordinarily be treated as an issue of weight, not admissibility, of the challenged testimony.
In Rochelle v. State Road Department, 196 So.2d 477 (Fla. 2d DCA 1967), the Second District held that the trial court had erred in striking the testimony of an expert appraiser. The opinion explained that an appraiser-expert's evaluation method is not a matter that relates to the competency of his testimony "unless the method used by the witness is so totally inadequate or improper that adoption of the method would require departing from all common sense and reason or would require adoption of an entirely new and totally unauthenticated formula in the field of appraising." Id. at 479. The opinion further held that the method of evaluation and the consideration of the comparable properties utilized to determine the assessment should be considered as matters going to the weight and not the competency of his testimony. Id.
Similarly, in State Road Department v. Falcon, Inc., 157 So.2d 563 (Fla. 2d DCA 1963), the Second District held that the trial court erred by ordering a new trial based on the erroneous admission of an expert appraiser's testimony. See id. at 566. In that case, the expert witnesses testified that they had not considered a particular real estate transaction in determining the value of the condemned property. See id. at 564. The court identified two factors as relevant in determining whether the expert's testimony was properly excluded: (1) prejudice to the appellee's case and (2) the overall competence of the expert's testimony as a result of the failure to consider one transaction. See id. at 566. With respect to prejudice, the court said, "Obviously, the mere fact that the testimony depreciated the recovery sought by the appellees was not a sufficient ground for excluding the testimony if it was competent, relevant and material." Id. at 566.
In determining competency of the expert's testimony in Falcon, the opinion explained:
Upon examination of relevant authority, both in the cases and the texts, the conclusion is inescapable that the failure of an otherwise competent expert witness to consider one of numerous factors involved in assessing compensation goes not to his competency or the competency of the testimony but only to the weight of the testimony. 1 Orgel, Valuation Under Eminent Domain §§ 132-133 (1953); 5 Nichols, Eminent Domain §§ 18.4[4], 18.42[1] and 18.46 (Rev. 3rd ed.1962). See e.g., Hubbard v. Harris County Flood Control Dist., Tex.Civ. App., 1956, 286 S.W.2d 285.
See Falcon, 157 So.2d at 566. The Second District reversed and remanded the new trial order for a judgment consistent with the jury verdict, see id. at 566-67, because the trial court failed to make the finding that the jury "was deceived as to the probative force or weight of the testimony," and because the testimony at trial "was competent and susceptible of consideration." Id. at 566.
We find the reasoning of these Second District opinions to be correct and their application persuasive here, and we conclude that DOT's expert appraiser's testimony was properly admitted insofar as it was relevant to determining damages and material to DOT's case. Furthermore, with respect to the overall competence of the testimony, we find that it was competent. As the Rochelle opinion makes clear, an appraiser's opinion may be subject to impeachment or to having its weight reduced because of its failure to properly consider one of the many factors that may influence an opinion as to value, but that failure should not prevent the *288 opinion's admission, nor cause its complete exclusion from the jury's consideration. See City of Vero Beach v. Schwey, 308 So.2d 178 (Fla. 4th DCA 1975) (holding that differing features of a comparable sale of real property were not a sufficient basis to reject expert testimony in an eminent domain proceeding, instead the differences went to the amount of weight to be afforded by the jury); see also White v. Westlund, 624 So.2d 1148, 1151 (Fla. 4th DCA 1993) (holding that qualifications placed on a medical expert's opinion are matters of weight, not admissibility); Lombard v. Executive Elevator Service, Inc., 545 So.2d 453, 455 (Fla. 3d DCA 1989) (holding that summary judgment was improper where trial court excluded expert testimony due to expert's inability to testify as to exact cause of elevator malfunction, as the deficiency in the expert's testimony related to weight, not admissibility); H.K. Corp. v. Estate of Miller, 405 So.2d 218, 219 (Fla. 3d DCA 1981) (holding that the testimony of plaintiffs's expert witness was properly admitted into evidence on the basis that the sufficiency of the facts required to form an opinion must normally be decided by the expert himself and any deficiency relates to the weight rather than the admissibility of the expert's opinion); Rimmer v. Tesla, 201 So.2d 573, 577 (Fla. 1st DCA 1967) (determining that argument that medical doctor's testimony regarding precise time of death was insufficiently thorough was an issue of weight, not of competency or credibility).
These holdings are also consistent with provisions of the Florida Evidence Code, §§ 90.702, .705, Fla. Stat. (2002), which provide as follows concerning the admission of expert opinion testimony:
90.702 Testimony by experts.If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.
....
90.705 Disclosure of facts or data underlying expert opinion.
(1) Unless otherwise required by the court, an expert may testify in terms of opinion or inferences and give his reasons without prior disclosure of the underlying facts or data. On cross-examination the expert shall be required to specify the facts or data.
Therefore, in the instant case, even had DOT's expert failed to include the arbor area in his valuation of severance damages, we conclude that this exclusion would have gone to the weight, not the admissibility of his testimony. Further, as contemplated by the Evidence Code, and, as actually occurred here, the predicate for the expert's opinion was a proper subject of cross-examination.

Proposed Driveways
DOT also asserts that the district court erred in concluding that testimony regarding the department's proposed cure should have been excluded because it was inconsistent with the construction plans admitted in evidence in that the driveways for the proposed cure could not be constructed within the temporary construction easement set out in those plans. DOT contends that the district court's opinion requires the condemnor to change its construction plans to partially implement a proposed cure before the cure plan may even be admitted into evidence and considered by the appraiser or jury in assessing the fair market value of the remainder. Accordingly, DOT maintains that the district court's decision could lead to the exact unfair scenario this Court noted in *289 Patel, i.e., that the future contingency would not be considered by the jury, thereby increasing the severance damages and potential jury award, but also resulting in a windfall at taxpayers' expense if the owner should implement the cure in the future. See Patel, 641 So.2d at 44.
In concluding that the trial court erred in admitting testimony concerning DOT's proposed cure, the district court relied on Belvedere Development Corp. v. Department of Transportation, 476 So.2d 649 (Fla.1985), wherein this Court stated:
The second point raised by the petitioners is whether the state should have been permitted at trial to make certain promissory representations that they would or would not do certain things in the future which were not in the pleadings or construction plans offered in evidence. The petitioners assert that the damages caused by a project as contemplated by the construction plans in existence on the date of valuation and the pleadings govern the evidence of valuation and that representations of a purely promissory or speculative nature should not affect either the character or the extent of the damages the condemnor must pay as full compensation. We agree. When evidence in the form of plans and specifications is properly admitted for the purpose of providing a declaration of the manner in which the condemned property will be utilized, the Department should be bound by this evidence.
Id. at 653.[6] Despite DOT's argument that the evidence was only offered to show a potential cure which does not have to be a part of its construction plans, the district court stated that DOT "cannot be permitted to rely on a cure inconsistent with its own plans and whose implementation may be speculative at best and would require the use and appropriation of property to effect the cure different from that taken under the plans." Armadillo Partners, Inc., 780 So.2d at 237.
In the instant case, we conclude the district court erroneously held that the trial court erred in admitting testimony regarding DOT's proposed cure. The issue in this case is not whether DOT is bound by its construction plans insofar as how the condemned property will ultimately be utilized. In fact, DOT acknowledges that it is bound by such plans. Rather, the issue is whether a cure proposed by DOT, which admittedly may or may not be implemented by the property owner, must be consistent with the department's current construction plans for the roadway project. See Patel, 641 So.2d at 43 n. 6 (noting that a "duty to cure" is something of a misnomer since "neither party has an obligation to cure or mitigate anything").
As noted above, neither party has an absolute duty to implement a particular cure. Rather, a "cure" is in effect an alternative proposal that a prospective buyer may implement or undertake to restore value to the remainder. The district court's opinion, however, in essence placed the entire risk to implement the cure on *290 DOT and misapprehended the fact that any so-called "cures" will only be constructed by the landowner on the remainder parcel if the landowner determines they should be constructed at all.
Moreover, the district court's opinion also overlooks the fact that DOT offered binding testimony from Douglas Green, a DOT engineer, that the department would permit the driveways as depicted in DOT's cure plan should the property owner choose to implement the cure.[7]Cf. Division of Admin. v. St. Regis Paper Co., 402 So.2d 1207 (Fla. 1st DCA 1981) (finding trial court did not err in denying admission of disputed evidence where there was no binding witness authorized to make commitments for DOT on the details of the proposed connections or specific plans). We find Mr. Green's testimony sufficient to bind DOT and permit the introduction of DOT's proposed cure notwithstanding DOT's failure to include its proposed revisions in those plans. Cf. Belvedere Development Corp., 476 So.2d at 653.

CONCLUSION
For the reasons stated above, we quash the decision below and disapprove of the decisions in Byrd, Williams and Murray, to the extent they may be inconsistent with this opinion and approve the decisions in Rochelle and Falcon, Inc.
It is so ordered.
ANSTEAD, C.J., QUINCE and CANTERO, JJ., and HARDING, Senior Justice, concur.
WELLS, J., dissents with an opinion, in which LEWIS, J., and SHAW, Senior Justice, concur.
LEWIS, J., dissents with an opinion, in which WELLS, J., and SHAW, Senior Justice, concur.
PARIENTE, J., recused.
WELLS, J., dissenting.
I dissent from quashing the district court's opinion on the first issue in respect to the exclusion of the appraiser's testimony, which failed to account for the value of the loss of the trees. This area had value and was lost.
I would also approve the district court's decision on the second issue.
LEWIS, J., and SHAW, Senior Justice, concur.
LEWIS, J., dissenting.
Although I concur with the dissenting opinion of Justice Wells, I write separately to express my concern that the standard for the admissibility of expert opinion testimony propounded by the majority eviscerates the long-standing and broadly applicable rule that specifically excludes expert testimony when it contravenes established law. The decision to cast off this important evidentiary control will, in my view, foster misleading, as opposed to illuminating, expert testimony to the detriment of the justice system. The potential derogatory impact of the majority's decision cannot be understated given the ever-increasing number of cases that involve veritable seas of dense, sometimes arcane, and often conflicting expert testimony. Because I believe that the majority has erred, and that the error will have serious *291 and far-reaching implications, I must dissent.
It is beyond dispute that expert opinion testimony has heightenedand at times even perhaps undueinfluence on the minds of the jurors. See Kruse v. State, 483 So.2d 1383, 1386 (Fla. 4th DCA 1986) ("We are aware ... of the danger that the trier of fact may place undue emphasis on evidence offered by an expert, simply because of the special gloss placed on that evidence by reason of the witness' status as an expert."). Indeed, expert testimony is impactful by design as it is permitted only "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue." § 90.702, Fla. Stat. (2002).
Because of its heightened degree of influence, and the concomitant potential for deleterious effects on our justice system, statutory and common law safeguards have arisen to govern the admissibility of expert opinion testimony. For instance, Florida law protects against the usurpation of the factfinder's role by limiting expert opinion testimony to matters beyond the understanding of the average lay person. See Johnson v. State, 393 So.2d 1069, 1072 (Fla.1980). Additionally, rules adhered to by Florida courts ensure that purported experts are properly qualified, see Brooks v. State, 762 So.2d 879, 892 (Fla.2000), and that their testimony is limited to matters within the ambit of their expertise. See Hall v. State, 568 So.2d 882, 884 (Fla.1990). Other protections impact the content of the expert's opinion and its underlying basis. Experts are not permitted to opine on questions of substantive law, see In re Estate of Williams, 771 So.2d 7, 8 (Fla. 2d DCA 2000), and an expert's opinion will be inadmissible if based on insufficient data. See Brito v. County of Palm Beach, 753 So.2d 109, 114 (Fla. 4th DCA 1998).
Another protection, firmly rooted in Florida jurisprudence prior to the Court's decision in the instant case, is that expert opinion testimony is properly excluded when it runs contrary to established law. Indeed, it is difficult to conceive of evidence fraught with more potential to mislead factfinders than legally erroneous expert testimony. There is ample articulation of this rule in the arena of government takings. In a trio of cases decided by the First District Court of Appeal, the testimony of expert property appraisers was excluded because it misconstrued the law of severance damages by failing to account for the totality of lost value resulting from the respective takings. See State Dep't of Transp. v. Murray, 670 So.2d 977, 980 (Fla. 1st DCA 1996), quashed on other grounds, 687 So.2d 825 (Fla.1997); Williams v. State Dep't of Transp., 579 So.2d 226, 229 (Fla. 1st DCA 1991), disapproved in part by, Broward County v. Patel, 641 So.2d 40 (Fla. 1994); State Dep't of Transp. v. Byrd, 254 So.2d 836, 837 (Fla. 1st DCA 1971), disapproved in part by, Broward County v. Patel, 641 So.2d 40 (Fla.1994). The Second District has applied the same reasoning in striking expert opinion testimony pertaining to business damages in condemnation cases. See Mulkey v. State Div. of Admin., 448 So.2d 1062, 1067 (Fla. 2d DCA 1984) (determining that testimony regarding owner's ability to mitigate business damages should have been stricken as it was based on the misconception of law that owner could relocate parking onto a separate, vacant lot).
The rule prohibiting the admission of legally erroneous opinion evidence is by no means limited, however, to the law of eminent domain. The principle has been applied by Florida courts in numerous *292 contexts. For example, in Federated Department Stores, Inc. v. Doe, 454 So.2d 10 (Fla. 3d DCA 1984), a shopper who was accosted in a department store parking garage brought an action for damages against Burdines department store and Equity Properties (the shopping center's property manager), asserting negligent security planning. See id. at 11. In support of her position, the plaintiff introduced the testimony of an expert who opined that Burdines and Equity were each responsible for security outside of the store's premises. See id. Burdines objected to the testimony and moved for a directed verdict, asserting that as a lessee of the shopping center, it had no duty to maintain the security of common areas. See id.
In reviewing the trial court's denial of Burdines' motion, the district court held:
The trial court erred in not granting Burdines' motion for directed verdict.... The trial court also erred in allowing into evidence testimony of the plaintiff's expert to the effect that Burdines and Equity each had a duty to keep the parking area safe. "It is elementary that the conclusion or opinion of an expert witness based on facts and inferences not supported by the evidence in a cause has no evidential value." Arkin Construction Co. v. Simpkins, 99 So.2d 557, 561 (Fla.1957). An expert's opinion, if based upon an erroneous concept of law, is equally devoid of competency. See Stubbs v. State Department of Transportation, 332 So.2d 155 (Fla. 1st DCA 1976).
The jury in the instant case should not have received the incompetent testimony of the plaintiff's expert....
Id. at 12. Other courts have made similar determinations in wrongful death actions, see Rodriguez v. Pino, 634 So.2d 681, 686-87 & n. 7 (Fla. 3d DCA 1994) (determining that expert testimony should have been excluded where it was based on the legally erroneous conclusion that patient's extubation constituted a medical emergency allowing intubation without a competency assessment), worker's compensation cases, see Estate of Jenkins v. Recchi America, 658 So.2d 157 (Fla. 1st DCA 1995) (determining that an expert opinion founded on a factor not determinative of causation under Florida worker compensation law was incompetent evidence), and wrongful discharge actions, see Tenbroeck v. Castor, 640 So.2d 164, 168 (Fla. 1st DCA 1994) (concluding that expert opinion that teacher was impaired due to the notoriety created by a lawful marriage was contrary to established law and did not constitute competent evidence supporting dismissal).
The majority fails to heed this well-accepted principle in deeming admissible the testimony of the Department of Transportation's expert in the face of record evidence clearly establishing he did not consider the value of the shopping center's arbor area in calculating the severance damages. The majority acknowledges that the expert based his opinion regarding the post-taking reduction in property value primarily on the loss of parking spaces. See majority op. at 286. Ample record evidence shows, however, that the entirety of the expert's rent reduction calculation was based on the lost parking, that he assigned no value to the arbor area, and that he did not factor into his calculation the loss of the property owner's ability to make other uses of that area. I am unpersuaded by the majority's reference to the appraiser's statement upon cross-examination that he accounted for the loss of the arbor area by using comparable neighborhood properties (i.e., buildings abutting the street with no landscaping or up-front parking) to determine the rental value of the property after the taking.[8] *293 In my view, the record on this point is clearthe department's expert entirely failed to account for the value of the arbor area in reaching his conclusions regarding severance damages.
By eliminating the loss of the arbor area as an element of damages, the expert's opinion contravenes the law of severance damages, which provides that "full compensation" for a taking includes "both the value of the portion being appropriated and any damage to the remainder caused by the taking." Div. of Admin. v. Frenchman, Inc., 476 So.2d 224, 226 (Fla. 4th DCA 1985); see also § 73.071(3)(a)-(b), Fla. Stat. (2001). The majority does not purport to alter this rule of law, yet vitiates it by allowing an expertwith the heightened influence his position engendersto pick and choose among compensable elements of recovery and present his assessment as "full compensation." The result in the instant case is the uncompensated loss of real property.
While this case serves as a prime example of the impact of admitting legally erroneous expert testimony and incomplete damage assessments in the field of eminent domain, I must underscore the harm that may ensue should such a rule leach out into other bodies of law. Contrary to assisting the trier of fact, such testimony will mislead factfinders, resulting in erroneous and inequitable jury verdicts. In my view, the majority's decision constitutes an unjustified and unwise break with controlling precedent that will serve to undermine the interests of justice in this state. Accordingly, I dissent.
WELLS, J., and SHAW, Senior Justice, concur.
NOTES
[1] DOT also acquired a 3899-square-foot temporary construction easement along the property in order to tie-in and harmonize the existing driveways and to allow room for DOT to build a retaining wall.
[2] At the time of trial, Armadillo apparently had already started to actually implement its proposed cure.
[3] See State Dep't of Transp. v. Murray, 670 So.2d 977 (Fla. 1st DCA 1996), quashed on other grounds, 687 So.2d 825 (Fla. 1997); Williams v. State Dep't of Transp., 579 So.2d 226 (Fla. 1st DCA 1991), disapproved in part by Broward County v. Patel, 641 So.2d 40 (Fla.1994); State Dep't of Transp. v. Byrd, 254 So.2d 836 (Fla. 1st DCA 1971), disapproved in part by Broward County v. Patel, 641 So.2d 40 (Fla.1994).
[4] While our opinion in Patel is somewhat relevant to the present controversy, the actual issue resolved there is not the same. In Patel, a question was certified to this Court for resolution:

May the government submit evidence that the severance damages of a condemnee may be cured or lessened by alterations to the condemee's property when those alterations require the grant of a variance from the appropriate governmental entity having jurisdiction over the property?
Id. at 41. We answered the certified question in the affirmative, holding that such evidence is admissible where it can be shown that there is a reasonable probability of the variance being granted. See id. at 42-43.
[5] We conclude that the following testimony reflects that DOT's expert did account for the appropriation of the arbor area in his calculations:

[Q]: ... In connection with the shift of the parking lot by seven feet [sic] to the east in cutting off that seven feet [sic] you've referenced... you valued that property in no way other than the effect that it has on rental in the building; is that right?
[A]: That's correct, that's true.
....
[Q]: Isn't it correct that in your opinion of value you have not provided any compensation to the owner for the loss of those trees [in the arbor area]?
[A]: Well, I think I showed you some pictures of my comparable sales after and rent counts after and there were no trees, so I think it's been accounted for.
[Q]: It's been accounted for solely in connection with the effect on rental, correct?
[A]: Absolutely.
....
[Q]: ... In connection with the removal of the arbor, removal of the irrigation, removal of the planter area, removal of the nine foot by hundred and eighty foot stretch of property, you have not taken that into consideration in arriving at your compensation to be paid to property owner in this section, correct?
[A]: I certainly have and I would demonstrate.
[Q]: You have taken it into account in connection with reduced rental only; isn't that correct?
[A]: I would demonstrate my answer to that, by showing a picture of the rent comps in the immediate neighborhood that rent for twelve dollars a square foot with no landscaping, right on the street, no parking in front, no arbors, none of that and that was how I concluded the rent of eleven and a half dollars for this property, which will no longer have an arbor, no longer have the brick pavers or those landscaping strips, I believe on that basis, I have compensated for the loss of that in the proposed cure.
[Q]: Mr. Gallion, isn't it correct that the aesthetic or the appearance of a property is a factor that can be appraised?
[A]: That's right, the more attractive as to a limit, the more rent. As I said, I compared this property to the propertieslook at the pictures, they're not very attractive and that's how I judge the rent for this property and these are neighborhood properties.
[Q]: And isn't it correct as well, Mr. Gallion, that the function of an arbor as a waiting area or additional seating area, that is a factor in connection with a piece of property that be appraised as well?
[A]: I'm not so sure that does that, I think, part of one thing is the aesthetic thing, it doesn't provide any protection. If you were dining in the evening, there's no protection of it, with regards to this is a waiting area, waiting to have a drink and go inside or whatever, I'm not sure; and if there is some value to it, I would say it would be business value, which is not a part of the real estate.
[6] This Court subsequently reiterated this principle in Trailer Ranch, Inc. v. City of Pompano Beach, 500 So.2d 503 (Fla. 1986):

[I]t is settled law in this state that once plans and specifications are properly admitted for the purpose of showing the manner in which the condemned property will be utilized, the condemnor is bound by this evidence. See Belvedere Development Corp. v. Department of Transportation, 476 So.2d 649, 653 (Fla.1985), and cases cited therein. If, after damages are awarded for the taking, the condemnor fails to adhere to the binding plans, specifications and testimony as established at trial, the condemnee has a cause of action against the condemnor for additional damages.
Id. at 506.
[7] DOT entered into evidence a resolution authorizing Mr. Green to bind the department "on those issues regarding design and construction of the project, including the road and driveway connections." This resolution and Mr. Green's testimony would serve as an estoppel against DOT should the property owner subsequently decide to implement DOT's proposed cure.
[8] The majority attempts to innoculate the expert's testimony by reasoning that his method for calculating damages involved the comparison of rental values for similar properties, and that methods of evaluation should be treated as issues of weight, not admissibility. See majority op. at 286-87 (discussing with approval Rochelle v. State Road Dep't, 196 So.2d 477 (Fla. 2d DCA 1967), and State Road Dep't v. Falcon, Inc., 157 So.2d 563 (Fla. 2d DCA 1963)). This analysis ignores the fact that legal errorregardless of whether it occurs in the creation or application of the methodology employedremains legal error. I do not share the majority's confidence that jurors unfamiliar with the intricacies of condemnation proceedings will be equipped to perceive an expert's failure to account for all damage elements and discount his opinion accordingly.