CORTINAS, J.
When apt-named Galleon[1] first set out to develop its property, it could not have possibly imagined the tumultuous seas it would encounter in the decades that followed. While galleons have not been spotted on our shores since the Eighteenth Century, this is our Court’s seventh encounter with this case.'
We first visited this matter ten years ago in 2002, when Monroe County filed a petition for second tier certiorari review of a Final Judgment Granting Writ of Certio-rari entered by the first trial judge presiding over this matter, now-retired Circuit Judge Richard Payne. We denied the petition in Monroe County v. Galleon Bay Corporation, 876 So.2d 569 (Fla. 3d DCA 2004).
We then saw another appeal and a petition for a writ of prohibition in 2004. *557 These two cases were voluntarily dismissed. See State v. Bd. of Cnty. Comm’rs of Monroe Cnty., 908 So.2d 1077 (Fla. 3d DCA 2005).
In 2006, the matter returned to us by way of another petition for a writ of prohibition which we denied, as well as two other appeals which we affirmed. See State of Florida and Bd. of Cnty. Commr’s of Monroe Cnty. v. Galleon Bay Corp., 930 So.2d 627 (Fla. 3d DCA 2006); Bd. of Cnty. Comm’rs of Monroe Cnty. v. Galleon Bay Corp., 954 So.2d 1169 (Fla. 3d DCA 2007).
Now, after what Judge Payne fittingly referred to as an “odyssey of disappointment,” we revisit this case on plenary appeal. We reverse.

Factual Background

In the late 1960’s and into the 1970’s, Wolfgang Schleu and his wife, Hannelore Schleu, engaged in the acquisition of property on No Name Key, in Monroe County, Florida, for the purpose of developing residential subdivisions and selling the lots for residential purposes. No Name Key is located approximately 33.2 miles to the Northwest of Key West, Florida.
[[Image here]]
This case involves a portion of No Name Key called the Galleon Bay subdivision, which consists of 10.64 acres on No Name Key (the “Galleon Bay Property”). The Galleon Bay Property is presently comprised of 14 residential lots totaling 4.64 acres, a 2.05 acre land-locked lake which is surrounded by the residential lots, approximately 2.94 acres of land restricted in perpetuity by Conservation Easements, *558 and 1.01 acres of roads and utility easements.
In the 1960’s and 1970’s, Mr. and Mrs. Schleu had separately platted and developed two other subdivisions on No Name Key, namely Bahia Shores and Dolphin Harbour. Bahia Shores was a 91-lot residential subdivision developed in 1969 and Dolphin Harbour was a 44-lot residential subdivision developed in 1970.
By 1984, Mr. and Mrs. Schleu were the sole owners of Galleon, which owned the Galleon Bay Property. Wolfgang Schleu passed away in 1984 and Hannelore Schleu became the sole shareholder of Galleon as a result. Not long thereafter, the Schleus’ daughter, Vivienne, became Galleon’s principal.
On September 15, 1986, the Galleon Bay Property was re-zoned to a “Commercial Fishing Village” (“CFV”).[2] This type of zoning district allowed both residential development and limited commercial fishing uses. This was done at the request of Galleon and William Moore, the president of the Organized Fisherman of Florida who, at the time, held an option to purchase the Galleon Bay Property.[3] In accordance with the CFV zoning classification and the Monroe County Code of Ordinances (“Code”), three residential dwelling units (“Lots”) were allowed, per acre, on the Galleon Bay Property. Subtracting the area of the lake and other areas which could not be developed, there remained approximately 8.6 upland acres, which, as a matter of right, equated to as many as 25 Lots on the Galleon Bay Property, based upon the density of 3 Lots per acre allowed by the Code.[4] In 1989, the Florida Department of Environmental Regulation (“DER”) denied an application for a permit to dredge a channel from the lake located on the Galleon Bay Property to Florida Bay, and thereafter, the option to purchase the Galleon Bay Property was allowed to expire.
In 1990, Galleon submitted an application to plat the Galleon Bay Property for 42 Lots.[5] After negotiations with the County, Galleon agreed to reduce the number of Lots to 14 single-family-lots, well below the 42 Lots originally sought, or the 25 Lots to which, presumably, Galleon would have been entitled as a matter of right. The Monroe County Commission (“Commission”) approved the plat in January 1991. The approved plat for the Galleon Bay Property, including the 14 Lots, is below:
*559 [[Image here]]
However, the Florida Department of Community Affairs (“FDCA”) appealed the approved plat, and in response, Galleon filed suit against both the County and the FDCA. The lawsuit and FDCA’s appeal were both eventually settled, and after a compromise was reached, on April 21, 1994, the Commission approved a revised plat of the Galleon Bay Property by resolution. The revised plat was recorded along with a required Conservation Easement and a Declaration of Restrictions (“Declaration”). The Declaration, provided, in pertinent part that:
4. No one or more of said lots shall be used except for single family residential purposes and for those uses permitted under the “Commercial Fishing Village” (CFV) zoning designation of the Monroe County, Florida, Land Use Regulations, Volume III adopted February 28, 1986, and effective September 18,1996.
(emphasis added). Under the revised plat, while the Galleon Bay Property retained *560 the 14 lots, the sizes of the lots were noticeably reduced. The new plat appeared as follows:
[[Image here]]
Until the approval of the revised plat, Galleon was unable to conduct any development activity on the Galleon Bay Property. In the intervening period of time, the County adopted Ordinance 16-1992, the Rate of Growth Ordinance (“ROGO”), which became effective on July 18, 1992. Under ROGO, the number of building permits for single-family homes issued by Monroe County was limited by using a point system. In accordance with the ordinance, separate queues were established for the Upper Keys, the Middle Keys, and the Lower Keys. When a building permit application is submitted, that applicant competed for one of the allocated permit slots with others in his or her queue for that particular quarter of the year. In *561 order to be awarded a building permit, an applicant needed to be placed in one of the predetermined number of allocated slots available. Galleon submitted building permits for each of its 13 Lots in September 1996.[6] In early January 1997, the applications were then placed in the ROGO queue for the Lower Keys.[7]

Beneficial Use Determination and Vested Rights

In 1996, the ROGO plan was modified through the Florida Keys Year 2010 Comprehensive Plan (“2010 Plan”), which replaced the prior 1986 Comprehensive Plan. Included in the 2010 Plan were “grandfathering” provisions allowing landowners to file applications for administrative vested rights determinations and Beneficial Use Determinations (“BUD”). In January 1997, in accordance with the 2010 Plan, Galleon filed applications for a vested rights determination and a BUD. Following an evidentiary hearing on the vested rights application, the Hearing Officer entered an order granting vested rights which made several findings of fact, including that “[d]uring the period beginning with the initial plat approval on May 20, 1991, and ending on April 27, 1998, the applicant expended and obligated the sum of $578,670.00 to develop, permit, and sell the subject lots.” The Hearing Officer further concluded that:
[Galleon] ... acting in good faith, has made such a substantial change of position, and has incurred such extensive obligations and expenses that it would be highly inequitable and unjust to affect those rights by requiring [Galleon] to now conform to the land development regulations contained in the Year 2010 Comprehensive Plan, or to any land development regulations adopted after the plat was approved.
Despite the Hearing Officer’s recommendation that Galleon’s request for vested rights be granted, the Commission, following a twenty-five-minute hearing at which Galleon was allowed roughly only five minutes to argue, denied the recommended order.
Galleon sought review of the Commission’s denial by way of a petition for writ of certiorari in May 1999. Circuit Judge Richard Payne granted Galleon’s petition in September 2002. The final judgment made several findings, tracking the steps taken by Galleon in its quest to develop its property and addressing the errors committed by the Commission’s rejection and denial of the Hearing Officer’s recommended order.
In 1988 [Galleon] began the process of platting the subject parcel. After negotiating with Monroe County planning staff, Hearing Officer Tr. at 133-135, [Galleon] agreed to the first exaction by Monroe County by agreeing to plat only 14 lots, a 44% reduction from its allocated density of 25. The [FDCA] appealed the plat approval to the Florida Land & Water Adjudication Commission. After three more years, [FDCA], the County and [Galleon] reached a settlement that *562 included approval of a revised plat, in which [Galleon] agreed to another exaction. The revised plat includes a conservation easement on both the manmade lake and the open space (land not designated as lots or roads), amounting to 48% of the subject property.... Recording the plat with the conservation easement left [Galleon] with nothing except the 14 lots and the roads.
After giving up 44% of its density, and conserving 48% of its land, to get a plat approved, the Commission cannot now say [Galleon] may not rely on the County’s two plat approvals as a basis for being grandfathered from the restrictions of the 2010 Plan. A local government may not whittle away a landowner’s property rights in exchange for meaningless land use approvals. Nor can the Commission pretend it did not know the intended use of the 14 lots it had approved on No Name Key. Plat approval was merely the first step in an overall project to build infrastructure, sell the lots and/or build homes thereon. Furthermore, [Galleon] filed building permit applications on all of the 13 lots that it owned.
There is no dispute over Hearing Officer Finding of Fact 15 (Commission Order No. 16), which states that from the date of the initial Plat approval, until the date of the evidentiary hearing, [Galleon] “expended and obligated the sum of $578,670 to develop, permit, and sell the subject lots.” At oral argument, the County argued “only about $35,000” of this total should be considered as funds expended on the lots. However, this Court does not have the power to reweigh competent substantial evidence that was accepted by both the Hearing Officer and the Commission.
[[Image here]]
One of the factual showings required of Galleon Bay, by the 2010 Plan’s grandfathering provision, was to show that “... the development has commenced and has continued in good faith without substantial interruption.” Policy 101.18.2(2)(a)(4)(b). The 2010 Plan also amended Monroe County ordinance 16-1992, the Dwelling Unit Allocation ordinance, commonly called the ROGO (for “Rate of Growth Ordinance”). The ROGO amendments alone were sufficient to make it practically impossible to build homes on Galleon Bay Subdivision. However, the only way a property owner could be compensated for land rendered unbuildable was to submit building permit applications to the County and wait four years before they would become eligible for compensation or a building permit.
To meet both the “development has commenced and continued” prong of the 2010 Plan’s grandfathering provision, and ultimately either receive building permits or just compensation, [Galleon] expended $35,062 during 1996 for the preparation and submission of applications for permits to construct single-family dwellings on the 13 remaining lots it owned at Galleon Bay Subdivision. These applications were submitted to Monroe County in September 1996. The 13 applications were placed in the ROGO queue in January 1997, and remained pending when the Commission’s hearing was held.
In conclusion, this Court finds that the Commission applied the incorrect law to the facts in this case. The Commission’s approvals of the Galleon Bay Subdivision plats, in 1991 and 1994, were just the first steps in the overall process of developing the property for single-family residential development. The Court cannot accept the Commission’s tacit arguments *563 that it had no idea [Galleon] wanted to build homes on the 14 lots, or that it thought [Galleon] just wanted to plat its property in order to make it possible to sell land by lot numbers rather than metes and bounds descriptions. That might have worked in 1910, but in 1910 local governments did not negotiate concessions and conservation easements from plat grantors. The plat approvals have no value in isolation; they only have value if the end goal is achieved. The inescapable conclusion is that [Galleon’s] expenditures of over a half-million dollars were 100% applicable to the development of the 14 platted lots in Galleon Bay Subdivision, and were not applicable solely to the process of drawing lines on a piece of paper.
[[Image here]]
A Hearing Officer was appointed by the Commission to hear applications for “vested rights” under the 2010 Plan. The Hearing Officer conducted the evidentia-ry hearing in this matter, listened to the testimony, observed the demeanor of the witnesses, and reviewed the documents introduced into evidence. The function of the Hearing Officer is minimally set out in Policy 101.18.1(2) and (8) of the 2010 Plan, as follows:
A determination of vested rights ... shall require:
2. appointment of a hearing officer who shall give notice, schedule, and conduct a public hearing on the application;
3. the preparation of proposed Determination including findings of fact and conclusions of law which shall be submitted to the Board of County Commissioners;
Section 9.5 — 182(b)(5), in effect from September 15, 1986, to September 12, 1998, does not conflict with the 2010 Plan. It sets forth the following procedure for the Commission to follow upon receipt of a Recommended Order, although the “standards set out in section 9.5-188” conflict with the standards set out in Policy 101.18.2(2), and the latter would control.
(5) Within thirty (30) working days after receipt of a hearing officer’s recommended findings of fact and proposed order, the board of county commissioners shall adopt the recommended findings of fact and proposed order, with or without modifications or conditions, or reject the hearing officer’s recommendation. The board of county commissioners shall not be authorized to modify or reject recommended findings of fact or a proposed order unless the board finds that the record does not contain competent substantial evidence to support the recommendation or that the proposed order is contrary to standards set out in section 9.5-183 (Ord. No. 33-1986, § 8-302)
This Court finds that there is nothing in the record below to demonstrate that the Commission determined any portion of the Recommended order was not supported by competent substantial evidence, as required by United States Casualty Co. v. Maryland Casualty Co., supra, and Section 9.5-182(b)(5), MCC. As a result, the Commission’s final order denying vested rights is itself not supported by competent substantial evidence and must be quashed.
(Emphasis added). In 2002, the County sought second-tier certiorari review in this Court. We denied the County’s petition in June 2004. See Monroe Cnty. v. Galleon Bay Corp., 876 So.2d 569 (Fla. 3d DCA 2004).

The Inverse Condemnation Action

In May 2002, while it was pursuing administrative relief, Galleon sued the Board *564 of County Commissioners (“BOCC”) for inverse condemnation. The State of Florida was later sued as a third party defendant. On the issue of liability, Judge Payne entered a judgment in favor of Galleon, which was later amended in January 2006. Following the judgment on liability, the State and the BOCC filed a petition for writ of prohibition, which we denied in State of Florida and Board of County Commissioners of Monroe County v. Galleon Bay Corporation, 930 So.2d 627 (Fla. 3d DCA 2006).
Next, the issue of compensation for the inverse condemnation was tried, and the jury returned a verdict in the amount of $3,000,000 in favor of Galleon. Believing that the jury had split the proverbial baby and awarded an amount that was roughly the midpoint between the $6,000,000 value amount to which Galleon’s expert had testified and the $250,000 amount to which the County’s expert had testified, Galleon moved for a new trial on damages. The trial court entered an order on September 12, 2006, granting a new trial as to the value of the Galleon Bay Property, finding in part that
The evidence presented by Defendant’s expert [Trent Marr] as to market value and as to highest and best use was essentially speculative and conjectural without foundation in objective facts which could form a basis for said opinions. [Marr’s] testimony should have been stricken in accordance with the principals set forth in Florida Department of Transportation v. Armadillo Partners, Inc., [849 So.2d 279 (Fla.2003)], and Hall [Holl] v. Talcott, [191 So.2d 40 (Fla.1966) ].[8]
The County and State appealed the order granting a new trial, arguing that the trial court erred in its determination that Marr’s expert opinion appraisal testimony was inadmissible, and we affirmed the order, without opinion, in Board of County Commissioners of Monroe County v. Galleon Bay Corporation, 954 So.2d 1169 (Fla. 3d DCA 2007). By the time the appeal was concluded, Judge Payne had retired.
However, in what can only be described as highly unusual, the successor judge, Judge David Audlin, did not conduct a new trial on damages as contemplated by his predecessor judge or this Court. Instead, the successor judge revisited the earlier grant of summary judgment on liability in favor of Galleon and vacated the predecessor judge’s order on summary judgment. This, of course, sent the entire case back to square one. Shortly thereafter, Galleon filed a motion to disqualify Judge Audlin, which the trial court granted.[9] Soon *565 thereafter, the case was reassigned, and ultimately tried, before yet another judge. Following a bench trial on liability, the trial court entered a final judgment in favor of the BOCC and the State (“Final Judgment”).

Analysis

In addressing whether a “taking” has occurred, the United States Supreme “Court’s decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations.” Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (emphasis added). The Supreme Court has also “frequently observed that whether a particular restriction will be rendered invalid by the government’s failure to pay for any losses proximately caused by it depends largely ‘upon the particular circumstances [in that] case.’” Id. (citation omitted). Furthermore, the United States Supreme Court has also found “categorical treatment appropriate ... where regulation denies all economically beneficial or productive use of land.” Lucas v. So. Carolina Coastal Council, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Moreover, the Court has stated “on numerous occasions [that] the Fifth Amendment is violated when land-use regulation ‘does not substantially advance legitimate state interests or denies an owner economically viable use of his land.’ ” Id. at 1016 (citation omitted) (emphasis in original).
Here, the trial court, purportedly applying the standards set forth in Penn Central and Lucas, determined that a taking had not occurred. The trial court incorrectly analyzed several factors which eventually led to its flawed conclusion.
Without testimony or record evidence for support, the trial court improperly found that Galleon’s “original investment backed expectations have been met.” It did so by admittedly lumping Galleon’s 13 Lots with Mr. and Mrs. Schleu’s prior development of Bahia Shores and Dolphin Harbour, which had occurred decades ago. The trial judge, citing State Department of Environmental Regulation v. Schindler, 604 So.2d 565 (Fla. 2d DCA 1992), determined that it would “look at the property as a whole as opposed to merely the affected portions” in arriving at the conclusion that the 12 acres[10] comprising the platted Galleon Bay Property are but a small part of the approximate total of 90 acres on No Name Key developed by Mr. and Mrs. Schleu. Thus, the trial court determined that a taking did not occur with respect to the Galleon Bay Property based on the separately-platted Bahia Shores and Dolphin Harbour subdivisions, which had been developed decades ago. We find this was error.
The Schindler case does not support the trial court’s holding. In simplest terms, the property at issue in Schindler was a 3.5 acre parcel of land encompassing 5 lots where 1.85 acres of the area had become submerged due to erosion. Id. at 566. Eventually, the appellees acquired the full 3.5 acres of land but were unable to obtain a permit to fill the submerged 1.85 acres. Id. The appellees in Schindler then sued the Department of Environmental Regulation and the Board of Trustees of the *566 Internal Improvement Trust Fund for inverse condemnation. Id. The appellate court found that the “[a]ppellees ha[d] not rebutted the presumption that physically contiguous parcels are one unit,” and also specified that “[t]he submerged land which appellees argue is separate from the uplands is not platted as a separate piece of property as were the lots in [Department of Transportation v. Jirik, 498 So.2d 1253 (Fla.1986)].” Schindler, 604 So.2d at 567. Holding that there remained questions of fact as to “whether, when considering the 3.5 acres as a whole, a taking has occurred,” the trial court reversed the partial summary judgment. Id. at 568.
Here, unlike in Schindler, the Galleon Bay Property had been individually platted, as were the Bahia Shores and Dolphin Harbour subdivisions decades earlier. In contrast, the land at issue in Schindler was merely a submerged portion of the lots, with nothing to characterize it as a separate or individual parcel of land. Thus, Schindler in no way supports the trial court’s finding that Galleon’s original investment backed expectations have been met.
Moreover, the trial court, without any meaningful analysis, summarily disposed of the Florida Supreme Court’s holding in Jirik which is both applicable and controlling. Jirik, 498 So.2d 1253. The trial court stated in its Final Judgment:
The Defendant’s [sic] through their case demonstrated that the property has a variety of economically viable uses. [Galleon] could have built at least 1 house. Both the ROGO regulation and the deed restriction specifically permit aggregation of lots. Moreover, the Court finds that contrary to [Galleon’s] position, the legal principles set forth in DOT v. Jirik, 498 So.2d 1253 (Fla.1986) do not prohibit the aggregation of lots to build a single dwelling for purposes of determining an economically viable use of the property.
(Emphasis added). Jirik does not support the trial court’s holding. Id. The Florida Supreme Court held, in Jirik, that “vacant city property constitutes presumptively separate units if platted into lots.” Id. at 1257. The Florida Supreme Court stated:
Given the complexity and formalities of modern-day city planning, we believe that a presumption of separateness as to vacant platted urban lots is reasonable and would facilitate the determination of the separateness issue in the absence of contrary evidence. As one commentator noted, considerable time and expense is necessary to bring a modern subdivision to the platting stage.
Id. (citation omitted) (emphasis added). That Jirik involved a “city” lot does not render its holding or rationale inapplicable to this case. On the contrary, the record in this case shows the “complexity and formalities” of planning as well as the “considerable time and expense” to bring Galleon’s particular Lots to the platting stage. Although the Defendants cursorily dismiss Jirik’s application simply because it involved urban property, the plethora of restrictions, regulations, and particular environmental considerations implicated in platting this property in the Florida Keys suggests otherwise.
Moreover, as Judge Payne correctly observed, the platting process for the Galleon Bay Property began in the late 1980’s, continued for several years during which the County gave two plat approvals, and contributed to what, at the time, was an expenditure of $578,670 to develop, permit, and sell the platted lots. As Judge Payne noted, “[p]lat approval was merely *567 the first step in an overall project to build infrastructure, sell the lots and/or build homes thereon.” Moreover, in his order granting summary judgment on the issue of liability, Judge Payne had addressed Jirik and found that:
The use of the adjective city in Jirik cannot be read to mean an incorporated municipality because Ms. Jirik’s lots were in Tavernier, in the Florida Keys, not in an incorporated city. [Galleon’s] lots are not in an incorporated city, but the Galleon Bay subdivision is bounded on the west by the 44-lot Dolphin Harbour residential subdivision and the 91-lot Bahia Shores residential subdivision. The Galleon Bay subdivision and its neighboring subdivisions are just as much of a “city” as Taver-nier was in 198.
(Emphasis added). Here, the trial court misapplied the Florida Supreme Court’s holding in Jirik and improperly considered the separately platted Bahia Shores and Dolphin Harbour subdivisions, which had occurred decades earlier, in determining that Galleon’s investment backed expectations were met.
The trial court also erred in its interpretation of Restriction 4 of the Declaration of Restrictions pertaining to the Galleon Bay Property, which was executed by Galleon in 1994, and duly recorded in Official Records Book 1305, Pages 1581-85 of the Public Records of Monroe County.
Restriction 4 provides as follows:
4. No one or more of said lots shall be used except for single family residential purposes and for those uses permitted under the “Commercial Fishing Village” (CFV) zoning designation of the Monroe County, Florida, Land Use Regulations, Volume III adopted February 28,1986, and effective September 18,1986.
(Emphasis added).
This particular restriction was reviewed and analyzed by Monroe County’s Director of Planning, Timothy J. McGarry, in a letter to the Executive Director of the Monroe County Land Authority on January 26, 1998. Mr. McGarry, as the Director of Planning for Monroe County, determined as follows:
Development on the lots must also comply with the attached deed restrictions, which have been in effect since the plat was recorded. The restrictions state that development on the lots must include a single family home with commercial fishing use. Therefore, commercial fishing uses could not be permitted independently of or prior to a single family home permit.
(Emphasis added.)
Despite the unambiguous use of the word “and” in the text of Restriction 4, as well as the determination by Monroe County’s Director of Planning that “and” meant “and,” the trial court found otherwise. Instead, the trial court, without setting forth a cognizable basis, found that the word “and” in Restriction 4 actually meant “or.” We find that the trial court departed from “the principle of contract interpretation which requires that the words used by the parties must be given their plain and ordinary meaning.” Beans v. Chohonis, 740 So.2d 65, 67 (Fla. 3d DCA 1999). Of course, “‘and’ is a conjunction to mean that both elements must be met.” Harrington v. Citizens Prop. Ins. Co., 54 So.3d 999, 1003 (Fla. 4th DCA 2010) (finding that the word “and,” as used in the insurance contract before the court, “join[ed] the elements of “where you reside’ and ‘which is shown as the ‘residence premises’ in the Declarations’ .... [Such that] [b]ased on the plain, unambiguous *568 meaning, to meet the definition, one must both reside in the dwelling, and that location must be shown as the ‘residence premises’ in the Declarations.”). While we acknowledge that “[c]ourts may construe ‘and’ as ‘or’ in statutes where a construction based on the strict reading of the statute would lead to an unintended or unreasonable result and would defeat the legislative intent of the statute,” see Byte Intern. Corp. v. Maurice Gusman Residuary Trust No. 1, 629 So.2d 191, 192 (Fla. 3d DCA 1993) (citing Winemiller v. Feddish, 568 So.2d 483, 485 (Fla. 4th DCA 1990)), we find these cases distinguishable in that the language at issue before us is a restriction to land use, freely negotiated and agreed upon by parties, as opposed to a statute. Moreover, in this case, the use of the word “and” is entirely consistent with Galleon Bay Property’s zoning as a “commercial fishing village.”[11] The trial court was, quite simply, not free to redefine the word “and” in Restriction 4.[12]
Having erred in misinterpreting “and” to mean “or” in Restriction 4, the trial court then compounded its error by relying on the testimony of Trent Marr. In the Final Judgment, the trial court stated:
16.[t]he question is has [Galleon] been deprived of all or substantially all of the economically viable use of the property? The Court finds that it has not. While [Galleon] took the position that if the property could not be built upon it had no use and thus little, if any value, the Court finds otherwise.
[[Image here]]
18. The Court finds that per the testimony of Trent Marr, the property had an economically viable commercial fishing use for trap storage with a value of $250,000. The Court finds that [Galleon’s] arguments and attempts to undermine, attack, or discredit Mr. Marr’s opinion are unpersuasive. First of all, the Court finds that trap storage is a physically and legally possible use to which the property could be put. In this regard, the Court finds Defendant’s Exhibit 4, a June 29, 1990 memorandum[13] from Vivienne Schleu/[Galleon] to the Planning Commission, wherein on page 4, Ms. Schleu explains why the property is suitable for trap storage, to be a piece of evidence strongly supporting the viability of [lobster or crab] trap storage.
Of course, Mr. Marr’s testimony that the Galleon Bay Property could be used solely for “trap storage,” without a required *569 residence under Restriction 4, entirely depended on the trial court’s misinterpretation of the word “and” to mean “or.” Relying on Mr. Marr’s testimony, the trial court further found that “the application of the ROGO did not diminish the value of the property at all,”[14] since, according to the trial court, Galleon could use its IB Lots for “trap storage.”
Thus, by 1) misapplying the Florida Supreme Court’s holding in Jirik, 2) improperly considering the Bahia Shores and Dolphin Harbour subdivisions in determining Galleon’s investment-backed expectations, 3) misinterpreting the word “and” in Restriction 4 to mean “or,” and 4) improperly relying on the testimony of Trent Marr for its determination that Galleon’s 18 Lots could be used for “trap storage,” the trial court erred in its determination that Galleon had not been deprived of all or substantially all of the economically viable use of its property.
Based upon the numerous errors we have addressed herein, we reverse and remand with instructions that the trial court enter a judgment of liability in favor of Galleon with a corresponding takings order and allow the case to proceed to a compensation trial.
Reversed and remanded.

. Galleon Bay Corporation, a Florida corporation.

. Prior to this, the Galleon Bay Property had been zoned "General Use," which allowed a density of one lot per acre.

. The re-zoning to CFV occurred as part of a plan to create a channel from the lake on the Galleon Bay Property to the Gulf of Mexico.

. See Monroe Cnty., Fla.Code of Ordinances, § 9.5-262; Ord. No. 33-1986, § 9-302; Ord. No. 26-1995, § 1; ord. No. 041-2003, § 1. The applicable provisions have been renumbered in Monroe County., Fla., Code of Ordinances, art. V§ 130-157 (2012).

.The Code also allowed for up to 12 Lots per "buildable area," in conjunction with the use of Transferable Development Rights. This equated to potentially 82 Lots on the Galleon Bay Property.

. By this point in time, one of the lots had been transferred to Dorothy Sue Abbott, in satisfaction of money she had previously loaned to Galleon.

. By 2001, the Galleon Bay Property remained in the ROGO queue and Galleon Bay filed a separate application for administrative relief, as it was entitled to do following four consecutive annual allocation periods. See Monroe Cnty., Fla.Code of Ordinances, § 9.5-122(h)(1). Under the Code, the County could take various actions in response to the request for administrative relief, but ultimately decided to extend an offer to purchase the property from Galleon "at its fair market value.” See Id. at § 9.5-1222(h)(6). The purchase never came to fruition.

. Approximately twelve (12) days prior to the commencement of trial, Mr. Marr completely changed his theory of appraisal. While he had been appraising the Galleon Bay Property for several years as having single family residential use as its highest and best use, shortly before trial, he changed his opinion to conclude that lobster and stone crab trap storage was the highest and best use.

. The motion to disqualify included the affidavits of both Galleon’s principal, Ms. Vivienne Schleu, and its counsel, attorney James Matt-son. Ms. Schleu's affidavit stated in pertinent part:
On January 30, 2006, during a hearing on the governments’ motions for summary judgment ... before Chief Judge Richard Payne, I overheard an Assistant Monroe County Attorney make a statement to his defense colleagues, to the effect that the defendants could expect a different outcome from Judge Audlin ... that "things would be different” after Judge Payne retired. I believe he made the statements after Judge Payne made his oral rulings.
In his affidavit, Mr. Mattson stated that he had overheard the same statements. Mr. Mattson also asserted that at a case management conference, Judge Audlin "intimated that he was prepared to reconsider all non-final orders rendered by Judge Payne.” The State and the County filed motions for reconsideration of Judge Payne’s prior order grant *565 ing summary judgment on liability. Judge Audlin granted the motions for reconsideration and ultimately vacated the order granting summary judgment.

. Although the trial court references "12 acres,” the Galleon Bay Property is actually 10.64 acres.

. The Code presently defines the purpose of the commercial fishing village district (CFV) as follows:
The purpose of the CFV district is to establish areas where limited commercial fishing activities, including the mooring of boats, the nonmechanized off-loading of catches, the storage of a limited number of traps, and residential uses, can be integrated.
Monroe Cnty., Fla.Code of Ordinances, art. V§ 130-31(2012).

. We are compelled to note, even though Galleon does not raise this particular issue on appeal, that on the first day of the liability trial, the Plaintiff called Donald Craig, a consulting land use planner, as a witness. Mr. Craig testified, in relevant part, that the Declaration required both a single-family residential dwelling and some degree of commercial fishing use for each lot. On the morning of the second day of trial, the trial court, at the behest of the defendants, and despite the testimony merely reflecting the plain language of the Declaration and Mr. McGarry's letter, struck Mr. Craig’s testimony on the grounds that it constituted "surprise.”

.This memorandum, of course, is dated four years before the final approval and recording of the applicable Galleon Bay Property plat and Declaration.

. Judge Payne had previously found that Mr. Marr’s testimony should have been stricken in the earlier compensation trial.